Michael L. Rains (CASBN 91013)
Justin E. Buffington (CASBN 248183)
2300 Contra Costa Blvd. Suite 500
Pleasant Hill, CA 94523
Telephone:  (925) 609-1699
Facsimile:    (925) 609-1690

Attorney for Defendant ARSHAD RAZZAK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ARSHAD RAZZAK, RICHARD YICK AND RAUL ERIC ELIAS,<br><br>Defendants | CASE NO.  CR-14-00103 RS<br><br>**DEFENDANT ARSHAD RAZZAK'S AMENDED PRETRIAL CONFERENCE STATEMENT AND TRIAL MEMORANDUM**<br><br>Trial Date: January 12, 2015<br>Pretrial Conference: December 19, 2014 |

San Francisco Police Officer Arshad Razzak ("Razzak"), by and through his counsel of record, Michael L. Rains and Justin E. Buffington, hereby submits his Pretrial Conference Statement and Trial Memorandum in the above-captioned case.

### I. STATEMENT OF FACTS

**A.  The Indictment and Subsequent Proceedings**

On February 25, 2014, a grand jury returned an Indictment naming in Count One Officers

1

Razzak, Raul Elias and Richard Yick with conspiring to violate civil rights, in contravention of 18 U.S.C. § 241, and in Count Three with deprivation of civil rights under color of law on or about January 5, 2011, in violation of 18 U.S.C. § 242.  The remaining counts of this six-count indictment charge Officers Razzak and Yick individually or collectively.  Count Two charges Officers Razzak and Yick with deprivation of rights under color of law on or about December 23, 2010, in violation of 18 U.S.C. § 242.  Count Four charges Officers Razzak and Yick with falsification of records on January 19, 2011.  Count Five charges Officer Razzak with falsification of records on December 24, 2010.  Count Six charges Officer Yick with falsification of records on January 5, 2011. All alleged falsifications are charged as violations of 18 U.S.C. § 1519.

The trial was initially scheduled for September 8, 2014. On August 28, 2014, the Court granted Officer Yick's motion to continue the trial, postponing the trial until January 12, 2015, with jury selection set for January 9, 2015.

**B. The Charged Offenses**

The elements of 18 U.S.C. § 241, conspiracy against civil rights, are:

*First*, that a defendant agreed with one or more persons to injure, oppress, threaten or intimidate one or more victims; *Second*, that a defendant intended by the agreement to hinder, prevent or interfere with a person's enjoyment of a right secured by the Constitution or laws of the United States; *Third*, that one or more of the intended victims was an inhabitant of California, meaning that the person was physically present in the state of California at the time of the deprivation; and *Fourth*, that a defendant acted under color of State law, meaning, for purposes of this case, that the defendant was acting in the official capacity of a police officer at the time of the deprivation.

The elements of 18 U.S.C. § 242, deprivation of rights under color of law, are:
*First,* a defendant was acting under color of law when he committed the acts charged in the indictment; *Second*, a defendant deprived a person of his right to be free from unreasonable searches and seizures by those acting under color of law--a right secured by the Constitution or

laws of the United States; and *Third,* a defendant acted willfully, that is, the defendant acted with a bad purpose, intending to deprive a person of that right.

The elements of 18 U.S.C. § 1519 are *First*, that the defendant knowingly altered, destroyed or concealed, falsified or made a false entry in any record, document, or tangible object; *Second,* that the defendant acted with the intent to impede, obstruct or influence the investigation of, or proper administration of, a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States and, *Third,* that the defendant did so, knowing about or contemplating a federal matter, within the jurisdiction of the Federal Bureau of Investigation.

**C. Statement of the Case**

Officers Razzak, Elias and Yick are police officers for the San Francisco Police Department ("SFPD"). Razzak, Elias and Yick began working as a unit of undercover officers, along with Ofc. Robert Forneris, Ofc. Raymond Kane, Ofc. Arthur Madrid, Ofc. Gregory Buhagiar, under the supervision of Sgt. Samuel Christ, around January 2010.

Ofc. Razzak, who grew up in San Francisco's Tenderloin District, graduated from the San Francisco Police Academy in December of 1995. Shortly after beginning his career in the patrol division, on the recommendation of a supervisor, Razzak was transferred to the SFPD vice crimes unit, where he operated in a plainclothes capacity. Razzak received little to no specific formal training relating to plainclothes police work or vice crimes operations; nearly everything that he learned in that regard came from informal, on-the-job training.

After working 3 years, between 1996 and 1999, in plainclothes-vice at the Richmond Station, the unit disbanded as a result of staffing issues, and Razzak returned to patrol for approximately 1 year. It was then that Razzak was approached by a lieutenant who asked him to return to work in the plainclothes unit, this time at the Ingleside station. Next, in 2000, Razzak transferred to the Southern Station, where he worked in the patrol division for approximately 1 year.

Sometime during 2001, Razzak began working in the plainclothes unit at the Southern Station. At various points from 2001 to the end of 2009, Razzak worked with Ofc. Joe Garbayo, Ofc. Kirk Leong, Ofc. Shaun Ryan, Ofc. Gregory Buhagiar and Ofc. Neil Cunningham, none of whom are named in this indictment.

In very early 2010, Sgt. Samuel Christ undertook supervision of the Southern Station Plainclothes Unit and. Sgt. Christ recruited Officers Raul Elias, Rick Yick, Arthur Madrid, Robert Forneris and Raymond Kane, to join Officers Razzak, Buhagiar, Carl Bryant, Louie Wong and Matt Cole. Shortly after that, Officers Bryant, Wong and Cole were transferred to other assignments. Each of the remaining officers assigned to the Plainclothes Unit from January 2010 through March 2011, came from diverse backgrounds, with different interests in policing and found their way to that unit by way of assignment, rather than their own selection.

From early 2010 until March 2011, the overwhelming majority of work undertaken by the officers in the Southern Station Plainclothes Unit involved robbery abatement operations, narcotics surveillance and street-level "buy-bust" operations. A full 80% of cases reported by the Plainclothes Unit during this time period involved active participation by 7 or more officers, including supervisors. There were no cases where the 3 alleged conspirators worked alone together. Despite the fact that the 3 defendants are indicted together as co-conspirators, they worked regularly and continuously with at least 3 other officers during all of the operations and with Sgt. Christ on most.

In addition to engaging in robbery abatement, narcotics surveillances and "buy-bust" operations, all for which they received documented positive feedback from superiors, the officers were tasked with reducing the salient narcotics trade at Single Room Occupancy Hotels ("SROs") in the South of Market neighborhood in San Francisco. Tackling the formidable drug trade at the SROs came with its own set of challenges because the owners and clerks at some of these SROs, such as the Henry Hotel, were actively complicit in the narcotics trade by tipping off drug dealers who inhabit these hotels to the presence of police at the hotel and as to their anticipated

destination. In fact, one of the Government's potential witnesses, Mr. Christopher Easterling (a prolific narcotics dealer who, for a time, rented up to 18 rooms at the Henry Hotel from which his underlings would peddle his drugs) told the FBI that the owners of the Henry Hotel knowingly and willingly stashed contraband, including the proceeds of Mr. Easterling's narcotics business, in a safe behind the front desk of the hotel. Further, Mr. Easterling revealed that the front desk clerks, as well as the hotel owners, regularly warned him about police presence at the Henry Hotel and utilized the Hotel's vast system of surveillance cameras to telephonically communicate with Mr. Easterling's drug runners, so that they could quickly hide or discard contraband to avoid potential arrest.

On December 23, 2010, Officer Razzak developed information from a confidential reliable informant that an African-American male, later identified as Carlos Hutcherson, would be found in room 504 of the Henry Hotel with heroin for sale. The room was being rented by a Caucasian woman, later identified as Jessica Richmond, who went by the street name of "Hatter." The informant indicated to Ofc. Razzak that he had just recently been in the hotel room and that he could confirm that Mr. Hutcherson was in possession of heroin.

Razzak, who regularly worked with Ofc. Buhagiar, but was working with Yick due to Buhagiar's absence from work that day, contacted other members of the Plainclothes Unit, including Robert Forneris and Arthur Madrid, to assist them with the "freezing" of room 504 so that a search warrant could be procured for that room. Razzak had received minimal training regarding the "freezing" of premises, though he had seen Ofc. Buhagiar do so at least once in the past.

Upon arrival of Forneris and Madrid, a master key was obtained from the front desk clerk. In an effort to prevent the clerk from tipping off the room's occupants, several registration cards for various hotel guests were pulled along with the registration card associated with room 504. Officer Madrid took the master key and the group of officers proceeded toward room 504. It was the understanding of all officers on scene that the plan was to freeze the room, to prevent the

destruction of narcotics, while a search warrant was procured.

As the officers approached room 504, voices were audible from within. Officer Madrid has testified that it sounded as though persons inside were talking on the phone before officers made their presence known, when suddenly it became quiet and people could be heard inside shuffling about. Knowing that the front desk clerk at the Henry Hotel was apt to call up to residents to tip them off about police presence, and having heard what sounded like a telephonic conversation abruptly ending followed by shuffling about immediately after police presence was announced, and knowing the destructible nature of narcotics, Officer Madrid used the passkey to open the door to the room. As Madrid opened the door, he observed an African-American (Mr. Hutcherson) male sitting in a chair by the door holding a crack cocaine pipe in his hand, who Madrid described as preparing to smoke crack. The man also appeared to be under the influence of heroin.

As Madrid and Ofc. Forneris entered the room to secure it, he observed a Caucasian female (Jessica Richmond) with dreadlocks approaching the door. Mr. Hutcherson was escorted out of the room and handed over to Ofc. Forneris who conducted a search incident to arrest, whereupon he located heroin.

Following Mr. Hutcherson's arrest, Jessica Richmond, who was never handcuffed, spoke with Ofc. Razzak. Razzak explained to her that he intended to obtain a search warrant to which Richmond replied that the police could search her room because she had nothing to hide. Razzak then requested a "consent to search form" be delivered by a patrol unit, which was delivered and which Richmond subsequently signed.

Immediately following this arrest which took place at approximately 7:15 p.m., Razzak and other members of the Plainclothes Unit acted on additional tips, resulting in the seizure of 8 ounces of methamphetamine. The operation that netted the methamphetamine lasted until the early morning of the December 24th, when Razzak endeavored to author the police report documenting the arrest of Mr. Hutcherson. Razzak completed the incident report concerning Mr.

Hutcherson's arrest some 8-9 hours after that arrest, to the best of his ability.

It was later alleged by San Francisco Public Defender Jeff Adachi that a video from surveillance cameras at the Henry Hotel appeared inconsistent with the report authored by Ofc. Razzak in that it is not readily apparent that Ofc. Madrid engaged in a "knock and notice" prior to entering room 504. Ofc. Madrid has testified under oath that he simply does not recall whether he provided "knock and notice". The surveillance cameras at the Henry Hotel recorded movement at such a slow frame rate such that they do not, by any means, capture every movement undertaken by those who appear in the video.

On January 5, 2011, Officer Razzak received a specific tip from a person who he understood to be a reliable informant, that an African-American male and female were selling heroin out of room 509 of the Henry Hotel, that the room was registered to the woman, and that the male resident of the room was on probation.

Before getting to room 509, the officers confirmed at the reception desk that the room was registered to a woman--further corroborating the informant's tip. While at the door to room 509, the female resident of the room, Tarasa Gates, came to the door via the hallway and, after some conversation with the officers, proceeded to start opening the door. As the door opened, and prior to completely entering the room, Officer Elias saw an African American male inside the room and confirmed from the man his name, and the fact he was on probation. Officer Elias then completed his entry into the room for the purpose of conducting a probation search on the man. Once inside the room, while performing the probation search, Officer Elias saw what he believed to be heroin bindles on the dresser inside the room, whereupon he placed the man under arrest. Subsequent investigation proved the substance seized was heroin. After entering the room to search and, later, arrest the man, Officer Elias called into police dispatch via his mobile radio and obtained formal confirmation of the man's probation status with a search condition.

Officer Razzak had extremely minimal involvement in this incident; other than receiving a tip from an informant and relaying that tip, Razzak merely provided cover for Ofc. Elias, who

took it upon himself to play the lead role in this case by contacting, engaging and arresting the male probationer, Donald Walton, located in room 509.

      Officer Yick wrote a police report concerning the January 5, 2011, search and arrest of the male occupant.  In the report, Officer Yick described Officer Elias' conversation with the male and female suspects, including the man's admission of his probation status.  However, when writing the report, Officer Yick mistakenly recalled that the official confirmation of the man's probation status and search condition took place <u>prior</u> to Officer Elias' entry into the room--a representation belied by hotel surveillance footage and police department dispatch records.  The police report provided little additional detail related to the officers' initial entry into the room.  Officer Razzak played no role in writing or approving the report.

      Testimony by the Officers at a later preliminary hearing (Yick), and at a later suppression hearing (Razzak/Elias), were materially consistent with the incident report, but were contradicted by the surveillance footage with respect to <u>when</u> Officer Elias made the official inquiry to police dispatch concerning the male subject's probation status.  Razzak was not scheduled to testify at the suppression hearing but did so at the last minute upon the request of another member of the plainclothes team, who was leaving town for vacation, the night before the hearing.

      Razzak, having little to no independent memory of the events that transpired two-months prior, refreshed his memory in the customary manner, by reviewing the only thing that he had available to him at the time, the SFPD incident report from 1/5/11.  The suppression hearing resulted in the suppression of the evidence against Mr. Walton, and the dismissal of the case against him.

      Officer Razzak, who played an exceedingly minor role in the execution of the operation that occurred on January 5, 2011, had little independent recollection of this fairly routine probation search and when he testified as to the happenings of that evening, was forced to rely on the police report as his only means of recollection.  Any differences between the police report and the any video evidence that might be introduced at trial is attributable to Yick's mistaken memory

of the events that he chronicled in the incident report from January 5th.

On January 19, 2011, Officer Razzak, in conformity with a widespread practice in the SFPD vice unit, obtained money to compensate the informant who had supplied the information that led to the detention and arrest of Carlos Hutcherson and the subsequent seizure of a sizeable amount of heroin from Mr. Hutcherson's person.

## II. JENCKS, BRADY, AND GIGLIO DISCLOSURE (Crim. L.R. 17.1-1(b)(1-3))

Officer Razzak has complied with all of his Rule 16 reciprocal discovery obligations. Similarly, the United States appears to have complied with its Rule 16 discovery obligations, as well as the Jencks Act, 18 U.S.C. § 3500, and it appears to have supplied all materials that may be relevant under *Brady v. Maryland*, 373 U.S. 83 (1963). Like the government, the defense is continuing in its preparations for trial to interview witnesses and obtain additional evidence. The defense recognizes and will comply with its ongoing obligation to provide the government with reciprocal discovery pursuant to Rule 16 as it becomes available.

## III. STIPULATIONS (Crim L.R. 17.1-1(b)(4))

The defense plans to propose stipulations to the government on issues relating to facts that cannot reasonably be in dispute, the number of defense witnesses who need to be called at trial (e.g., records custodians), the authenticity of foundational records, and other issues suitable for stipulation in this case.

## IV. NEED FOR INTERPRETERS (Crim. L. R. 17.1-1(b)-(5))

Officer Razzak may be utilizing an interpreter, at his own expense, for a very limited purpose at trial.

## V. DISMISSAL OF COUNTS/ELIMINATION OF ISSUES (Crim L.R. 17.1-1(b)(6)

Officer Razzak is not presently aware of any counts to dismiss or issues to eliminate.

## VI. JOINDER/SEVERENCE (Crim. L.R. 17.1-1(b)(7))

There are no known joinder or severance issues.

## VII. INFORMANTS/PRIOR CONVICTIONS

The government is believed to have fully disclosed the identities of the informants pertinent to the case.

## VIII. WITNESSES

Officer Razzak will file a witness list prior to the start of the trial, or at such other time ordered by the Court, but reserves the right to call additional witnesses.

## IX. EXHIBITS (Crim. L.R. 17.1-1(b)(10)

Officer Razzak will file an exhibit list prior to the start of trial, or at such other time ordered by the Court. He reserves the right to add to and otherwise amend the list. All exhibits will be drawn from materials that the defense has received from the government, or that has been provided to the government as reciprocal discovery, with the exception of demonstratives and as-yet uncompleted summary exhibits. The defense will ask the government and the Court for permission to use any demonstratives or summary exhibits prior to doing so, and will allow the government reasonable time to inspect.

The defense will move to exclude any evidence offered by the government in its case-in-chief that was not produced prior to trial.

## X. OBJECTIONS TO EXHIBITS OR TESTIMONY (Crim. L.R. 17.1(b)(11))

The defense will file motions *in limine* to address objections to expected exhibits and testimony, to the extent they cannot be resolved by the parties in advance.

## XI. LEGAL ISSUES LIKELY TO ARISE AT TRIAL (Crim L.R. 17.1-1(b)(12))

The parties have discussed legal and logistical issues of which they are presently aware, and believe they have amicably resolved them. The government's Trial Brief and Pretrial Conference Statement accurately describes one outstanding logistical issue concerning the deposition of government witness J.R.

## XII. SCHEDULING (Crim. L.R. 17.1-1(b)(13))

DEFENDANT ARSHAD RAZZAK PRETRIAL CONFERENCE STATEMENT AND TRIAL MEMORANDUM

A reasonable estimate for presentation of the defense case-in-chief for Officer Razzak is approximately three days.

**XIII. JURY VOIR DIRE (Crim. L.R. 17.1-1(b)(14))**

Officer Razzak is preparing, and will circulate later this week to all counsel, a proposed juror questionnaire. It is believed this will facilitate efficient jury selection, given publicity this case and another recently tried SFPD case has generated. The defense requests that it have some time to conduct individual *voir dire*.

**XIV. JURY INSTRUCTIONS (Crim. L.R. 17.1-1(b)(14))**

The defense will file a set of proposed jury instructions prior to the start of the trial.

Date: December 15, 2014                    Respectfully submitted,

                                           RAINS LUCIA STERN, P.C.


                                           _____/s/_____
                                           Michael L. Rains
                                           Attorney for Officer Arshad Razzak

11

DEFENDANT ARSHAD RAZZAK PRETRIAL CONFERENCE STATEMENT AND TRIAL MEMORANDUM