Michael L. Rains, SBN 91013
Justin E. Buffington, SBN 248183
**RAINS LUCIA STERN, PC**
2300 Contra Costa Boulevard, Suite 500
Pleasant Hill, CA 94523
Telephone:   925.609.1699
Facsimile:   925.609.1690
Email:       mrains@rlslawyers.com
             jbuffington@rlslawyers.com

Attorneys for Defendant Arshad Razzak

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br>   v.<br><br>ARSHAD RAZZAK, RICHARD YICK, RAUL ERICK ELIAS,<br><br>           Defendants. | Case No. CR 14-00103 RS<br><br>DEFENDANT ARSHAD RAZZAK'S SENTENCING MEMORANDUM<br><br>DATE: August 30, 2016<br>TIME: 2:30 p.m.<br>DEPT: 3<br>Honorable Richard Seeborg |

## I. INTRODUCTION

The sentencing date for Defendant Arshad Razzak was continued by agreement of the parties and approval of the court from April 28, 2015 to August 30, 2016. This Sentencing Memorandum is intended to provide the Court an update on relevant information concerning the background of the continuation of the sentencing of Mr. Razzak and to provide the Court and the United States Government with pertinent information concerning Mr. Razzak's current personal and professional situation. U.S. Probation Officer Specialist Jill Polish Spitalieri provided the Court and Counsel Mr. Razzak's personal and family data in her Pre-Sentence Investigation Report beginning at page 10. While some of that information remains unchanged, the situation involving Mr. Razzak's employment,

1
**DEFENDANT'S SENTENCING MEMORANDUM**

his children, his wife and his mother have changed in the intervening year and are discussed below. Also discussed below is Mr. Razzak's cooperation with the government following his conviction.

### A. Mr. Razzak has complied with his commitments contained in the Post-Conviction Settlement Agreement.

On May 28, 2015 Mr. Razzak and counsel signed a "Post-Conviction Settlement Agreement" drafted by the United States. That agreement required Mr. Razzak to ". . . assist the San Francisco Police Department ("SFPD") and FBI to prepare materials for police officer training on adhering to constitutional standards, preparing honest and accurate reports and other paperwork, and following police department rules and regulations, and the consequences of failing to do these things. He was also required to ". . . respond truthfully and completely to any and all questions put to him by the U.S. Attorney's office, FBI, and SFPD, whether in interviews, before a grand jury or at any trial or other proceeding." Two other obligations were to ". . . provide all documents and other material asked for by the government" and ". . . testify truthfully at any grand jury court or other proceeding as requested by the government."

After Mr. Razzak signed this agreement and committed to these obligations, he participated in two lengthy interviews. The first interview was conducted by the FBI and the U.S. Attorney's office, including John Hemann, the Prosecutor in this matter. Mr. Razzak answered all questions posed to him by the interrogators and was fully cooperative in every respect during the interview.

Thereafter, a second interview was scheduled to include the U.S. Attorney's office, the FBI and representatives of the SFPD's Internal Affairs Division. Once again, Mr. Razzak answered all questions posed to him by the representatives of these various agencies including the SFPD's Internal Affairs Investigators. He was candid with them about his own misconduct, about issues which led to the charges filed against him and other members of the plain-clothes unit, and answered questions that related to potential misconduct of other police officers including issues concerning racial misconduct in the department.

Counsel for Mr. Razzak is aware that, as a result of Mr. Razzak's interview with the SFPD's Internal Affairs Investigators, other officers in the SFPD faced the prospect of disciplinary actions up to and including termination when charges were filed against them with the San Francisco Police

Commission. Counsel is aware of this fact because he has talked to several other lawyers who represent other officers who were mentioned by Mr. Razzak during these interviews and those attorneys have advised Counsel that Mr. Razzak's interview led to the issuance of charges against their clients. In truth, Counsel does not know what the specific charges were against the other SFPD Officers, how many officers face charges or what the outcome of any such proceedings was or whether proceedings are still underway. However, Counsel is certain that the statements made by Mr. Razzak led to additional investigation of other officers for potential misconduct arising out of the operation of the plain-clothes unit and that disciplinary proceedings were instituted as a result of his statement.

      Counsel to Mr. Razzak has constantly, since signing the Post-Conviction Settlement Agreement, offered to the SFPD the full cooperation of Mr. Razzak in doing training at the police academy, or "in-service training" to experience officers, who are required to do in-service training every two years. Early in these Post-Conviction discussions, there was a suggestion that Mr. Razzak could perhaps prepare a training video that could be shown to other SFPD Officers concerning report writing issues and the issues which led to his conviction. Certainly, Mr. Razzak and Counsel have been amenable to that type of training as well, and Mr. Razzak's Counsel has, on at least five different occasions, tried to secure the cooperation of the SFPD in some type of training conducted by Mr. Razzak. Most of Counsel's attempts at getting this training approved and implemented have been done by and through discussions with Paul Chignell, a retired Captain with SFPD, who now serves as the legal administrators/coordinator for the San Francisco Police Officers Association.

      During the administration of former Police Chief Greg Suhr, Mr. Chignell advised Counsel that he was having trouble getting the training by Mr. Razzak approved by the then Deputy Chief in charge of that function. In truth, since the change in the current leadership of the SFPD, Counsel is not certain whether or not there has been any further attempt by Mr. Chignell to institute the training which Mr. Razzak has always been willing to conduct. In truth, Counsel has not discussed this subject with Mr. Chignell since Interim-Chief S.F.P.D. Tony Chaplin was appointed approximately two months ago.

**B. Update concerning Mr. Razzak's personal and family data.**

      Much of the information concerning Mr. Razzak's family/personal situation which Ms. Polish Spitalieri outlined on pages 10 through 12 of her Pre-Sentence Investigation Report remain the same,

although the relationship with his sister, Seema Khan, has significantly deteriorated in the last ten months. At the present time, although Ms. Khan and her husband continue to occupy the in-law suite in the basement of his home, they rarely talk or see each other, unless it is to argue. Both Ms. Khan and her husband work and she has never offered to assist Mr. or Ms. Razzak in any aspect of the around-the-clock care they provide to Ms. Khan's and Mr. Razzak's mother. To complicate matters, Mr. Razzak has been attempting to sell a house owned by his mother in Pakistan. The Court assisted with this transaction by allowing Mr. Razzak to renew his passport so he could get paperwork that would assist with the sale.

      Recently, Mr. Razzak's sister and her husband came into the Razzak residence during a day that Mr. Razzak was at work and began demanding that proceeds from the sale be distributed in a manner different than is the normal custom and practice in the Pakistani culture. That has resulted in even a further deterioration in the relationship between Mr. Razzak and his mother on the one hand, and his sister and her husband on the other.

      Since his conviction, Mr. Razzak has been continuously employed, driving for Uber at times, Side Car at times, and most recently, driving for DeSoto Cab Company. In order to try to maximize the income for his family, Mr. Razzak has been leasing a Medallion for the sum of $1,500 per month which allows him to drive for DeSoto Cab Company. In addition, he pays $1,250 each month to DeSoto Cab for what is known as a "color scheme" (a radio inside the car plus car insurance). He purchased a used cab which immediately started developing mechanical problems and he was forced shortly thereafter to replace the engine at a cost of $3,000. In addition, the cab was hit by a drunk driver and was out of service for nine (9) days getting repaired.

      Mr. Razzak normally drives the cab anywhere between five and seven days a week. He has acquired a weekend driver who only shows up on the weekends sporadically to drive. If the weekend driver does not appear, Mr. Razzak drives at least a portion of each day on the weekend, in addition to five days during the week.

      Mr. Razzak normally works anywhere between fifteen and twenty-two hours per day driving during the week. Mondays are the best day financially, because of activity at the airport. For that reason, he is driving anywhere between eighteen and twenty-two hours every Monday. His normal net

profit for a day involving eighteen to twenty-two hours of driving is $300 per day. Typically, Mr. Razzak makes a net profit of approximately $200 per day, and that requires driving of anywhere between fifteen to sixteen hours.

Mr. Razzak has been trying to take as much time as he can on the weekends off because he is "burned out" because of the amount of hours he spends driving during the week, and because those are the only days he can spend with his children and wife. On Saturday, if he is not working, he drives his son to soccer practice and stays with him. After soccer practice, Mr. Razzak and his family typically go grocery shopping which includes a trip to Costco. If he is not working on Sunday, he takes his daughter and son to the park and then they usually eat at the In-And-Out Burger. Mr. Razaak indicates that if he didn't see his kids on the weekend he would not see them at all because of the amount of hours he is working during the week.

Mr. Razzak's current long term "goal" is to open up an auto repair shop. He was trained as a mechanic twenty years ago but recognizes that he needs to go to school to become current on auto technology and repair. He indicates that the City and County of San Francisco continue to retain a sum of money representing his contributions to the retirement system which accumulated while he served as a San Francisco Police Officer. Although not certain, he believes this sum of money is approximately $125,000. He has been advised by a "woman" at the retirement system that they will not pay him anything until he is sentenced. His hope is that he can use some or all of his retirement money to purchase an auto mechanic shop so that he can quit driving a cab.

The firearms previously owned by Mr. Razzak have now been transferred out of his name and are in the process of being sold. Mr. Razzak communicates as required with Josh Libbey from Pre-Trial Services and has made all required appearances to see Mr. Libbey at his office.

Not only has Mr. Razzak, since his conviction, kept all of his commitments to the Court and to the Government as outlined in the Post-Conviction Settlement Agreement, but he has complied fully with all of his obligations to the Pre-Trial Services Unit. He has literally driven thousands and thousands of miles in the approximately eighteen month period since his conviction, and has not even been pulled over for a traffic violation let alone issued a traffic citation. In short, Mr. Razzak has remained a committed husband, father, provider for his family, and law-abiding citizen.

5
**DEFENDANT'S SENTENCING MEMORANDUM**

### C. Mr. Razzak requests consideration for a non-custodial sentence.

Defendant Arshad Razzak respectfully requests the Court to impose a sentence below the advisory guidelines range. As Ms. Polish Spitalieri pointed out in her Pre-Sentence Investigation Report (page 18), "the Defendant's children, wife and Mother rely on his income for financial support." In addition, Ms. Polish Spitalieri pointed out that "as a police officer the Defendant had a very stressful job, saved several lives and put his life in danger on a daily basis by being in contact with dangerous criminals."

What Ms. Polish Spitalieri *did not say,* and which warrants consideration by this Court is something that was testified to by other witnesses in this case including Officers Madrid and Forneris, specifically, when these offenses occurred. In addition, Mr. Razzak explained the same matter in greater detail when interviewed by the FBI and the U.S. Attorney's Office. Specifically, when Mr. Razzak was a member of the plain-clothes unit, that unit was charged with arresting no-less than eight suspects during any given shift and advised that if they were not able to meet that type of "quota," they would face reassignment. That "mandate" for the production of "bodies" by police officers is clearly a recipe for the type of disaster which occurred here, and can and often does lead to the abuses of constitutional liberties of individuals by police officers who are acting in an interest to achieve compliance with arrest statistics mandated by their employer. Just as here, in these types of situations, while the officers continue to "produce" the required numbers of arrests, they receive accolades, pats on the back, and plenty of deference by their bosses. When the practices engaged in by the officers become subject to question or scrutiny, those responsible for the institution of the statistical demands are nowhere to be found or disavow knowledge of the scheme completely. When questioned by the FBI following his conviction about the manner in which the plain-clothes unit operated, Mr. Razzak was truthful in explaining this aspect of the unit's operation. He did not do that as an attempt to provide an "excuse" for the conduct for which he was convicted. Indeed, he has always taken responsibility for his own conduct. However, that factor, it seems, would be appropriate for the court to consider in imposing a sentence below the advisory guidelines range.

/ / /

/ / /

## II. CONCLUSION

In the final analysis, due to the variety of factors discussed above, including Mr. Razzak's status as the sole economic provider to his family, the health of his mother, and driving limitations related to his wife, it is respectfully requested that the court impose a sentence which will allow Mr. Razzak the ability to remain out of custody.

Dated: August 23, 2016

Respectfully submitted,

RAINS LUCIA STERN, PC

By: _____
Michael L. Rains
Attorney for Defendant Arshad Razzak